ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2018-Jul-10 10:58:22
23CV-18-1018
C20D01 : 87 Pages

## IN THE COURT OF FAULKNER COUNTY ARKANSAS

**WILLIAM F. DOSHIER; and**
**dotStrategy, Co.**                                    **PLAINTIFFS**

**VS.**

**FACEBOOK, INC.**                                      **DEFENDANT**

## CLASS ACTION COMPLAINT

## JURY TRIAL DEMANDED

Plaintiff William F. Doshier, hereinafter referred to as DOSHIER, on

behalf of himself and dotStrategy, Co., hereinafter referred to as

DOTSTRATEGY, and all others similarly situated, alleges the following

against Defendant FACEBOOK, Inc., hereinafter referred to as FACEBOOK,

based on personal knowledge as to Plaintiff and Plaintiff's own acts and on

information and belief as to all other matters based upon, inter alia, the

investigation conducted by and through Plaintiff's undersigned counsel:

## SUMMARY OF THE CASE

1.      FACEBOOK operates a social networking website or community

that allows people to communicate and/or connect with their family, friends,

and other FACEBOOK users through the sharing of  information,

photographs, videos, and website links, as well as through the posting of

advertisements on FACEBOOK's social networking website or community.

2.      According to FACEBOOK, "Facebook is a community where

everyone uses the name they go by in everyday life. This makes it so that

you always know who you're connecting with."

3.   Yet, FACEBOOK knows that FACEBOOK users don't always know who they are connecting with.

4.   Facebook knows they have a fake account problem.

5.   According to the Wall Street Journal article, "Facebook Launches Tools to Stop Fake Accounts," dated June 28, 2018, FACEBOOK rolled out new tools "to make it easier to identify fake pages."

6.   According to the Wall Street Journal article, "Facebook Launches Tools to Stop Fake Accounts," dated June 28, 2018, FACEBOOK's Chief Operating Officer, Sheryl Sandberg, stated the following: "By far the most important action we are taking is going after fake accounts... Transparency helps us find and fix problems..."

7.   Furthermore, according to the Wall Street Journal article, "Facebook Launches Tools to Stop Fake Accounts," dated June 28, 2018, "Ms. Sandberg added that the company has learned that it underinvested in policing its platform, and said adding transparency could help hold Facebook accountable."

8.   According to FACEBOOK, "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."

9.   According to FACEBOOK's Company Info, FACEBOOK has "1.45

2

billion daily active users on average for March 2018."

10.   According to FACEBOOK's Company Info, FACEBOOK has "2.20 billion monthly active users as of March 31, 2018."

11.   FACEBOOK's Terms of Service states, "We help you find and connect with people, groups, businesses, organizations, and others that matter to you..."

12.   FACEBOOK's Terms of Service states, "Our Products help you find and connect with people, groups, businesses, organizations, and others that are important to you."

13.   FACEBOOK's Terms of Service states, "We show you ads, offers, and other sponsored content to help you discover content, products, and services that are offered by the many businesses and organizations that use Facebook and other Facebook Products."

14.   FACEBOOK's Terms of Service can be found at the following link: https://www.facebook.com/legal/terms

15.   With regard to "When to start advertising on Facebook," FACEBOOK states as follows:

> Facebook advertising is a powerful tool that can help you grow your business and reach new people on and off Facebook... If you're already leveraging Facebook and other online resources, then Facebook advertising may be a natural next step to reach more of the people you care about. If you're in a growth mindset and looking to build your audience, reach new people and drive results you care about, then give advertising a try. Note: Before you can start advertising on Facebook, there are a few key steps you should take. To start, you'll need to make sure you've

created a Facebook Page for your business and that your Page is set up for success. Your Facebook Page can add credibility to your Facebook ads and gives people a place to go to learn more about your business. Keep in mind that any ads you create that show up on Facebook will include your Page's profile picture and name in the top-right corner, both of which people can click to view your Page.

16.   The abovementioned quote from FACEBOOK regarding "When to start advertising on Facebook" can be found on FACEBOOK's Advertiser Help Center at the following link:

https://www.facebook.com/business/help/2006396992971451?helpref=page_content

17.   With regard to "Building a Page is the first step for businesses on Facebook," FACEBOOK states as follows:

There are many reasons why creating a Facebook Page is beneficial for the success of your business. Facebook Pages allow businesses to develop their brand, grow their audience and start conversations with customers and people interested in learning more. To create a Facebook Page, you'll need to already have a personal profile. This is because only people with profiles on Facebook can create or have a role on Pages.

18.   Furthermore, with regard to "Building a Page is the first step for businesses on Facebook," FACEBOOK states as follows:

Humanize your company... Creating an online presence for your business helps you build social connections with your audience and drive real business results. With a Facebook Page, you can curate the tone, style and personality of your business. You can also showcase your brand through photos and video through posts or Page Stories, or share personal epithets and engage in one-to-one conversations through comments and messaging. Putting a face to your business through a Facebook business Page reminds your audience that it's run by real people.

19.    Moreover, with regard to "Building a Page is the first step for businesses on Facebook," FACEBOOK states as follows:

> Learn about your target audience... As a business, you probably care deeply about your core audience–the customers who care most about what you have to offer [ADVERTISE]. With a Facebook Page, you can learn even more about your audience and find more people like them. When you create a Page, you can chat with customers directly through comments on your posts and Messenger. You can also see what customers are saying to each other. Gathering this feedback may help inform your business decisions and the content you share on your Facebook Page. Better yet, you can use your Page's Insights to understand the actions people take on your Page, like how often they like, comment on and share posts [BOOSTED POSTS/ADVERTISEMENTS]. You'll also have access to aggregate data about your audience's demographics, like age, gender and location.

20.    In addition, with regard to "Building a Page is the first step for businesses on Facebook," FACEBOOK states, "Build your community... With a Facebook Page, you have the opportunity to engage your community. You can post [ADVERTISE] about the newest products or services your business is offering, organize contests or run Facebook promotions."

21.    Also, with regard to "Building a Page is the first step for businesses on Facebook," FACEBOOK states as follows:

> Strengthen customer relationships... Growing customer loyalty is key for many businesses. A Facebook Page may help you build and maintain the loyalty you promise to your customers and the loyalty you desire from them in return. With a Facebook Page, you're able to stimulate your community of followers through promotions [BOOSTED POSTS/ADVERTISEMENTS] you create, the testimonials you share out and the conversations you facilitate.

22.   Furthermore, with regard to "Building a Page is the first step for businesses on Facebook," FACEBOOK states as follows:

> EXPOSE your brand... Exposing your brand on Facebook helps you increase awareness of your business. Whenever someone likes, comments or shares something from your Page, their friends may see that they engaged with it and may in turn go on to interact with your content or seek out more information about your business.

23.   Moreover, with regard to "Building a Page is the first step for businesses on Facebook," FACEBOOK states, "Drive traffic... A Facebook Page can help you drive [GENUINE] traffic to other sites you care about, like your website..."

24.   Finally, with regard to "Building a Page is the first step for businesses on Facebook" FACEBOOK states as follows:

> Unlock the power of Facebook advertising... Having a Facebook Page is a prerequisite to being able to advertise on Facebook. Facebook Pages are free and provide you with a place to create and manage ads. Facebook ads are a great way to grow your brand and audience on and off of Facebook and within your budget. Facebook ads can appear on Facebook (ex, mobile and desktop News Feeds), Instagram and Audience Network. Where you place your ads, the creative, targeting, budget and schedule of the ads you run is up to you. You'll have access to other Facebook advertising tools to help you understand what you're getting in return from each promotion you run. Additionally, Facebook advertising makes it easy to optimize your advertising efforts to ensure you're creating quality ads that help you reach even more people as your business grows.

25.   The quotes from FACEBOOK regarding  "Building a Page is the first step for businesses on Facebook" in  paragraphs 12-19 above can be found on FACEBOOK's Advertiser Help Center at the following link:

https://www.facebook.com/business/help/683232231880431?helpref = pag

e_content

26.    Hence, for all of the reasons listed above regarding "Building a

Page is the first step for businesses on Facebook," DOSHIER built a business

Page for DOTSTRATEGY.

27.    Plaintiff brings this class action suit against FACEBOOK for

improper charges that he incurred in connection with advertising he placed

on Defendant's website.

28.    "Self Service Advertisers," such as the Plaintiff, can create ads

through the boosting of posts directly from their FACEBOOK Page, or

through FACEBOOK's Ads Manager. The Ads Manager allows Self Service

Advertisers to set up an advertising account, design their ads, identify their

target audience among registered FACEBOOK users, and select how much

they are willing to pay for the advertising services.

29.    When Self-Serve Advertisers boost posts to advertise on

FACEBOOK, they contract with FACEBOOK, as they click on "Boost Now"

and accept the following terms:

> Terms & Conditions
> By clicking "Boost Now" you agree to the Facebook Terms of Service
> including your obligation to comply with the Self-Serve Ad Terms and
> the Facebook Advertising Guidelines. We do not use sensitive personal
> data for ad targeting. Topics you choose for targeting your ad don't
> reflect the personal beliefs, characteristics or values of users. Failure to
> comply with the Terms and Conditions, the Self-Serve Ad Terms and
> the Advertising Guidelines may result in a variety of consequences,
> including the cancellation of ads you have placed and the termination

of your account. Understand that if you are a resident of or have your principal place of business in the US or Canada, you are contracting solely with Facebook, Inc. Otherwise, you are contracting solely with Facebook Ireland, Ltd., except that advertisers in some countries may under certain circumstances contract directly with Facebook affiliate companies solely for purposes of ordering ads. If applicable to you, you can find special provisions applicable to your Orders from those affiliates here. Ad credit coupon terms and conditions may apply. See terms.

30.    FACEBOOK's Terms of Service links to the Self-Serve Ad Terms, and  states the following with regard to the Self-Serve Ad Terms: "5. Other terms and policies that may apply to you: Self-Serve Ad Terms: These terms apply when you use self-serve advertising interfaces to create, submit, or deliver advertising or other commercial or sponsored activity or content."

31.    FACEBOOK's Self-Serve Ad Terms can be found at the following link: https://www.facebook.com/legal/self_service_ads_terms

32.    FACEBOOK's Terms of Service also links to the FACEBOOK Help Center at the bottom of the Terms of Service page. The "Help" Center button, along with a number of other links, such as "Create Ad," is present on the printable version of FACEBOOK's Terms of Service as well.

33.    FACEBOOK users can navigate directly to the FACEBOOK Help Center from the FACEBOOK Terms of Service to find Help regarding the meaning of the terms that are used by FACEBOOK in their Self Serve Ad Terms.

34.    FACEBOOK's Help Center can be found at the following link: https://www.facebook.com/help/

35.     Help regarding the meaning of the terms that are used by

FACEBOOK in their Self Serve Ad Terms is found on the Advertiser Help

Center, which is prominently linked on the Help Center. Specifically, the Help

Center states, "Visit Ads Help Center" "Learn more about promoting your

business on Facebook." The "Visit Ads Help Center" is a link to the

Advertiser Help Center.

36.     FACEBOOK's Advertiser Help Center can be found at the

following link: https://www.facebook.com/business/help/

37.     The Advertiser Help Center has an "Ask a question" search tool

where a FACEBOOK user can find information regarding terms that are used

by FACEBOOK in their Self Serve Ad Terms, such as the term "invalid click."

38.     When the term "invalid click" is entered into FACEBOOK's

Advertiser Help Center's "Ask a question" search tool, the following article is

displayed as the FACEBOOK Answer:

How does Facebook prevent and detect invalid clicks?
https://www.Facebook.com/business/help/211248262238771

> We do a few things to reduce the risk of abuse from invalid
> clicks and help improve your ad performance like capping the
> number of times any ad is shown to a person, regardless of
> whether they click on the ad.
> There are two different types of clicks we consider invalid:
>
> [1] Clicks from people that don't indicate a genuine interest in
> the ad or show signs of ad testing. This includes repetitive or
> accidental clicks and visits from the Facebook corporate
> network.
>
> [2] Clicks generated through prohibited means, such as fake

accounts, bots, scrapers, browser add-ons or other methods that
don't follow Facebook Terms.

If we detect or are alerted to suspicious or potentially invalid
click activity, a manual review is performed to determine the
nature of the activity. You will not be charged for clicks that are
determined to be invalid.

39.     With regard to invalid clicks, FACEBOOK's Advertiser Help

Center unequivocally states "If we detect or are alerted to suspicious or

potentially invalid click activity, a manual review is performed to determine

the nature of the activity. You will not be charged for clicks that are

determined to be invalid."

40.     Yet, FACEBOOK's Self-Serve Ad Terms state, "9. We cannot

control how clicks are generated on your ads. We have systems that attempt

to detect [invalid click activity] and filter certain [invalid] click activity, but

we are not responsible for click fraud, technological issues, or other

potentially invalid click activity that may affect the cost of running ads."

41.     Hence, FACEBOOK's Advertiser Help Center clearly defines

"invalid click" as well as supplements the abovementioned Self-Serve Ad

Term with regard to invalid clicks, as FACEBOOK unequivocally states "If we

detect or are alerted to suspicious or potentially invalid click activity, a

manual review is performed to determine the nature of the activity. You will

not be charged for clicks that are determined to be invalid."

42.     The question posed by FACEBOOK on their website, "How does

Facebook prevent and detect invalid clicks?" implies that FACEBOOK does

indeed "prevent and detect invalid clicks."

43.    "Clicks generated through... fake accounts" are invalid clicks as defined by Facebook.

44.    FACEBOOK unequivocally states that Self-Serve Advertisers "will not be charged for clicks that are determined to be invalid."

45.    FACEBOOK represents that it has developed "systems that attempt to detect and filter certain click activity," or click filters, which have been designed to exclude certain types of clicks, defined as invalid clicks, specifically "clicks generated through ...fake accounts," from the click totals charged to Self-Serve Advertisers.

46.    To reiterate, FACEBOOK unequivocally represents that Self-Serve Advertisers "will not be charged for clicks that are determined to be invalid."

47.    It is on the representations by FACEBOOK in their Self-Serve Ad Terms, which state "We have systems that attempt to detect and filter certain click activity," and on the representations by FACEBOOK in their Advertiser Help Center concerning "How does Facebook prevent and detect invalid clicks?" that Plaintiffs rely for their claim that Facebook has a uniform contract for Self-Serve Advertisers regarding "valid" clicks and "invalid" clicks, which said contract specifically states, "You will not be charged for clicks that are determined to be invalid."

48.    Plaintiff contracted with FACEBOOK to pay FACEBOOK a fee

each time a FACEBOOK user (defined as persons registered with

FACEBOOK) clicked on Plaintiff's advertisements in an attempt to view the

advertisements. Plaintiff and FACEBOOK regarded such action by a

FACEBOOK user to be a valid or "billable click" for which advertisers were

contractually obligated to pay FACEBOOK a fee in accordance with the

contract.

49.    FACEBOOK, however, systematically fails to limit charges to

valid clicks from FACEBOOK users. Instead, Self-Serve Advertisers have

been and continue to be unlawfully charged for and presently pay for

numerous "invalid clicks," as a result of deficiencies in FACEBOOK's click

filters, which has resulted in Self-Serve Advertisers being charged for "Clicks

generated through... fake accounts" that FACEBOOK regards as invalid

clicks, yet they fail to filter out.

50.    FACEBOOK has consistently represented on its website that it

charges advertisers only for valid clicks and that it has measures in place to

reduce or eliminate invalid clicks, including but not limited to "Clicks

generated through... fake accounts."

51.    Plaintiff reasonably expected, based on FACEBOOK's own

statements, that Plaintiff would only be charged for valid clicks and that

FACEBOOK would have measures in place to eliminate invalid clicks and

would implement procedures to avoid billing for such clicks. Additionally,

since the date FACEBOOK began providing advertising services through the

present, FACEBOOK has failed to disclose or adequately disclose
information, namely, that it does not have the appropriate measures in place
to adequately detect and filter, or eliminate, invalid clicks and that it does
not implement appropriate policies and procedures to avoid billing for such
invalid clicks.

52.     Self-Serve Advertisers interested in advertising their goods or
services to FACEBOOK users contract with FACEBOOK to advertise on the
FACEBOOK website.

53.     Self-Serve Advertisers can choose to pay for and place their ads
on FACEBOOK pages based on a specific set of demographic factors aimed
at targeting FACEBOOK user's age, gender, or geographic location, as well
as select keywords which appear on a FACEBOOK profile page and may
indicate interests of the page owner or visitors to a page. This is commonly
referred to as "contextual advertising."

54.     Self-Serve Advertisements are displayed on a portion of the
page viewed by FACEBOOK users. If a user clicks on that advertisement,
FACEBOOK's policy is to charge the advertiser for the click irrespective of
whether the click actually resulted in a visit by a real person to the
destination URL. Indeed, FACEBOOK promises that the amount charged to
an advertiser will be the result of FACEBOOK users selecting the ad and
clicking on it. Self-Serve Advertisers contract with FACEBOOK with the
reasonable expectation that they will be charged based on actual and valid

clicks. Self-Serve Advertisers contract with FACEBOOK with the reasonable

expectation that they will be charged based on actual likes and shares from

real people with genuine accounts on the social network, or FACEBOOK

community, not invalid "clicks generated through fake accounts." To ensure

that occurs, FACEBOOK explicitly represents that it takes measures to

ensure that it reports and charges advertisers accurately and only for actual

and valid clicks generated by FACEBOOK users who click after having seen

the ad placed by the advertiser.

55.     In spite of FACEBOOK's contractual promises, Plaintiff and

other FACEBOOK Self-Serve Advertisers are routinely charged for invalid

clicks by FACEBOOK.

56.     FACEBOOK's failure to deliver on its promise to not charge for

invalid "clicks generated through... fake accounts"has resulted from

FACEBOOK presumably lacking the tools, or filtering systems to detect and

prevent the creation of fake accounts in the first place, as well as to detect

and delete fake accounts that have existed in their community, which has

resulted in the systemic failure of FACEBOOK to detect and filter invalid

"clicks generated through... fake accounts".

57.     FACEBOOK knows that they have a fake account problem, as

FACEBOOK rolled out new tools on June 28, 2018,  "to make it easier to

identify fake pages".

58.     Despite the fact that FACEBOOK has rolled out new tools,  "to

14

make it easier to identify fake pages," as discussed in the Wall Street Journal article, "Facebook Launches Tools to Stop Fake Accounts," dated June 28, 2018, FACEBOOK continues to ignore its responsibility to detect and delete fake accounts, as well as to detect and filter invalid "clicks generated through... fake accounts," as they are placing the burden of identifying fake accounts on the backs of FACEBOOK users, instead of doing the heavy lifting themselves.

59.    Unfortunately, FACEBOOK's new tools roll out   "to make it easier to identify fake pages"  is simply subterfuge on the part of FACEBOOK, which will allow it to continue to generate substantial and fraudulent ad revenue through invalid "clicks generated through... fake accounts."

60.    FACEBOOK understands that the average FACEBOOK Self-Service Advertiser doesn't have the resources to review every FACEBOOK account that has generated clicks on their ads to determine whether or not the FACEBOOK  accounts that have generated the clicks were fake or not.

61.    The result of FACEBOOK's systemic failure to detect and delete fake accounts, as well as to detect and filter invalid "clicks generated through... fake accounts" is that Self-Serve Advertisers are charged, and will continue to be charged, for numerous invalid clicks, as defined by FACEBOOK in their Advertiser Help Center as follows:

There are two different types of clicks we consider invalid:

[1] Clicks from people that don't indicate a genuine interest in the ad or show signs of ad testing. This includes repetitive or accidental clicks and visits from the Facebook corporate network.

[2] Clicks generated through prohibited means, such as fake accounts, bots, scrapers, browser add-ons or other methods that don't follow Facebook Terms.

62.     To reiterate, FACEBOOK also states the following in their Advertiser Help Center:

If we detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid.

63.     Yet, the result of FACEBOOK's systemic failure to detect and filter invalid click activity is that Plaintiff and Class members have been charged for a substantial number of invalid "clicks generated through... fake accounts."

64.     FACEBOOK deleted 583 million fake accounts in the first three months of 2018.

65.     On Tuesday May 15, 2018, FACEBOOK released its Community Standards Enforcement Report, "detailing how many spam posts it's deleted and how many fake accounts it's taken down in the first quarter of 2018." The following excerpt describes this process:

In a blog post on Facebook, Guy Rosen, Facebook's vice president of product management, said the social network [FACEBOOK] deleted 538 million fake accounts during the first three months of this year -- the majority of which, it said, were blocked within minutes of registration. That's an average of over

6.5 million attempts to create a fake account every day from Jan. 1 to March 31. Facebook boasts 2.2 billion monthly active users, and if Facebook's AI tools didn't catch these fake accounts flooding their social network, its population would have swelled immensely in just 89 days. Facebook has been dealing with mounting pressure from lawmakers and public opinion over how powerful it's become. In April, CEO Mark Zuckerberg testified before Congress, promising greater transparency and responsibility from the social network. Facebook has gone under intense scrutiny over issues of disinformation campaigns from Russian trolls, as well as a data scandal involving 87 million people. Fake and automated accounts plague other popular services too, including Twitter and YouTube. A Pew Research Center report in April said that two-thirds of tweeted links on Twitter came from bots... Rosen also said that Facebook blocks millions of fake account attempts every day from even attempting to register, but did not specify how many. A key tool in the fight against fake accounts: artificial intelligence. But AI isn't perfect. While it blocked more than 500 million fake accounts, Facebook estimates that about 3 percent to 4 percent of accounts on the [FACEBOOK] website are fake. Even at that low percentage, with Facebook's massive scale that's at least 66 million fake accounts hiding in plain sight on the [their] social network. Facebook's AI also went after 837 million spam posts in the first quarter, nearly all of which it deleted before anyone reported the posts."

See the article titled "Facebook deleted 583 million fake accounts in the first three months of 2018" at the following link:

https://www.cnet.com/news/facebook-deleted-583-million-fake-accounts-in-t he-first-three-months-of-2018/

66.     FACEBOOK acknowledges that they can indeed control invalid "Clicks generated through... fake accounts" by detecting and deleting fake accounts through the deployment of not only Artificial Intelligence systems, or click filters, but also by deploying Genuine Intelligence systems, through the utilization of effective policies and procedures and the deployment of an

adequate number of competently trained review staff, to not only prevent

the creation of the fake accounts on their platform in the first place, but also

to detect and delete fake accounts from their community, as they did during

the first three months of 2018.

67.    FACEBOOK's Self-Serve Advertisers are not obligated to pay for

invalid clicks from fake FACEBOOK accounts.

68.    The following Question at FACEBOOK's Advertiser Help Center,

"I want to dispute the Ad billing charges. Who do I speak to?," can be found

at the following:

> https://www.facebook.com/business/help/community/question/?id = 10
> 154236832293290

69.    To the Question at FACEBOOK's Advertiser Help Center, "I

want to dispute the Ad billing charges. Who do I speak to?," "Shawn" on

the "Facebook Help Team" replied with the following Featured Answer:

> Hello everyone,
>
> We do not have visibility into the account to provide specifics,
> however, if your advertising charges are different than expected, I
> recommend having a look in your ad account by visiting
>
> https://www.facebook.com/ads/manage
>
> while logged in to your Profile. Take a look at the campaigns, as well
> as view your payment history via the billing tab, double check the
> budget and schedule and verify that you did not have a previously
> outstanding balance.
>
> If your card was charged and the charges are showing on your
> statement, you can cross-reference the reference number on your bank
> statement with the charges in your ad account. There is a tool under

the billing tab in the main menu of your ad account. There is a full rundown of how to utilize it in our Help Center:

https://www.facebook.com/business/help/1674680089468704/?ref = u2u

If you see unauthorized charges, or ads you do not recognize, you can submit an inquiry form [Ads Payment Inquiry Form] here:

https://www.facebook.com/help/contact/649167531904667

and we will have a closer look at the account and work everything out with you.

70.     To reiterate, "Shawn" on the "Facebook Help Team" stated the following:

If you see unauthorized charges, or ads you do not recognize, you can submit an inquiry form [Ads Payment Inquiry Form] here:

https://www.facebook.com/help/contact/649167531904667

and we will have a closer look at the account and work everything out with you.

71.     On June 29, 2018, Plaintiff submitted an inquiry to FACEBOOK using the abovementioned Ads Payment Inquiry Form requesting that FACEBOOK review his account to determine whether and to what extent he had been charged for invalid "clicks generated through fake accounts".

72.     Specifically, on June 29, 2018, Plaintiff submitted the following inquiry to FACEBOOK using their Ads Payment Inquiry Form:

Greetings,

I am concerned with the likelihood of fake account activity within my Facebook ad account.

Recently Facebook deleted millions of accounts self described as fake. I believe fake Facebook accounts have contributed to clicks, likes, shares etc. on ads I've placed, thus resulting in a billable activity to my account.

Please accept this request for a 100% review of all billing associated with this account. Please advise your findings of any fake account activity taking place within my ad account.

Thank you,
Bill Doshier

73.    Despite FACEBOOK's representation, "we will have a closer look at the account and work everything out with you," FACEBOOK has failed to review DOSIHER's account, and they have failed to work everything out with him.

74.    If Ms. Sandberg is sincere that "adding transparency could help hold Facebook accountable," as she stated in the Wall Street Journal article, "Facebook Launches Tools to Stop Fake Accounts," dated June 28, 2018, then FACEBOOK should not object to Plaintiff's request that FACEBOOK be transparent and assist the court in holding FACEBOOK accountable for charging Plaintiff and Class members for invalid "clicks generated through fake accounts".

75.    FACEBOOK should be held accountable for charging  Plaintiff and Class members for invalid "clicks generated through fake accounts".

76.    FACEBOOK's conduct, as alleged herein, violates Ark. Code Ann. Sections 4-88-107, 4-75-201, et seq., and 4-75-309, and constitutes

breach of contract and common law fraud under Arkansas law.

## JURISDICTION AND VENUE

77.     The Circuit Court of Faulkner County, Arkansas, has jurisdiction

of this case because of the fact the Plaintiff and Class members are seeking

damages against the Defendant in this civil proceeding thereby giving this

court jurisdiction under Ar. Const. Art. 7, Sec. 11 and Ark. Code Ann. Sec.

16-13-201.

78.     The venue for this action is in Faulkner County, Arkansas,

pursuant to the provisions of Ark. Code Ann. Sec 16-60-113 and the fact

that some or all of the misrepresentations occurred in Faulkner County,

Arkansas, and, therefore, venue is proper under the decision of Evans

Industrial Coatings, Inc. v. Chancery Court of Union County, 315 Ark. 728,

870 S.W.2d 701 (1994).

79.     Federal court subject matter jurisdiction over this representative

action does not exist. Complete diversity of citizenship between Plaintiffs

and defendants does not exist. Plaintiffs assert no federal question and/or

violations of federal law.

80.     Plaintiff and Class members seek monetary damages of all

types, including but not limited to, compensatory and punitive damages, and

attorneys' fees, as well as any other monetary damages the court deems

appropriate as enumerated in the Prayer for relief, such as treble damages.

## PARTIES

81.    Plaintiff DOSHIER is a citizen and resident of Arkansas.

DOSHIER has a FACEBOOK account. DOSHIER is an entrepreneur, educator,

and small business owner. DOSHIER owns numerous digital properties.

DOSHIER owns the top level domain ".buzz." DOSHIER advertises on

FACEBOOK on behalf of dotStrategy, Co., to promote the top level domain

".buzz," as well as to promote various domain and digital properties affiliated

with the top level domain ".buzz," that he owns. DOSHIER receives bills

from FACEBOOK for ads that he has placed on behalf of dotStrategy, Co.,

and the various domain and digital properties affiliated with the top level

domain ".buzz," at his home business at 1920 Centennial Club Dr., Conway,

AR  72034.

82.    Plaintiff dotStrategy, Co., is an Arkansas for Profit Corporation.

The business address of dotStrategy, Co., is 1920 Centennial Club Dr.,

Conway, AR  72034.

83.    Defendant FACEBOOK is incorporated in Delaware, and the

Company's principal executive offices are located at 1601 Willow Road,

Menlo Park, California 94025. FACEBOOK's securities trade on the NASDAQ

under the ticker symbol "FB."

**FACTUAL BACKGROUND**

84.    FACEBOOK operates a social networking website or community

that allows people to communicate and/or connect with their family, friends,

and other FACEBOOK users through the sharing of  information,

photographs, videos, and website links, as well as through the posting of

advertisements on FACEBOOK's social networking website or community.

85.    FACEBOOK's Terms of Service can be found at the following

link: https://www.facebook.com/legal/terms

86.    FACEBOOK's Terms of Service states the following:

Our mission is to give people the power to build community and
bring the world closer together. To help advance this mission,
we provide the Products and services described below to you:

- Provide a personalized experience for you: Your experience
  on Facebook is unlike anyone else's: from the posts,
  stories, events, ads, and other content you see in News
  Feed or our video platform to the Pages you follow and
  other features you might use, such as Trending,
  Marketplace, and search. We use the data we have - for
  example, about the connections you make, the choices and
  settings you select, and what you share and do on and off
  our Products - to personalize your experience.
- Connect you with people and organizations you care about:
  We help you find and connect with people, groups,
  businesses, organizations, and others that matter to you
  across the Facebook Products you use. We use the data
  we have to make suggestions for you and others - for
  example, groups to join, events to attend, Pages to follow
  or send a message to, shows to watch, and people you
  may want to become friends with. Stronger ties make for
  better communities, and we believe our services are most
  useful when people are connected to people, groups, and
  organizations they care about.
- Empower you to express yourself and communicate about
  what matters to you: There are many ways to express
  yourself on Facebook and to communicate with friends,
  family, and others about what matters to you - for
  example, sharing status updates, photos, videos, and
  stories across the Facebook Products you use, sending
  messages to a friend or several people, creating events or
  groups, or adding content to your profile. We also have
  developed, and continue to explore, new ways for people

to use technology, such as augmented reality and 360 video to create and share more expressive and engaging content on Facebook.

- Help you discover content, products, and services that may interest you: We show you ads, offers, and other sponsored content to help you discover content, products, and services that are offered by the many businesses and organizations that use Facebook and other Facebook Products. Our partners pay us to show their content to you, and we design our services so that the sponsored content you see is as relevant and useful to you as everything else you see on our Products.

- Combat harmful conduct and protect and support our community: People will only build community on Facebook if they feel safe. We employ dedicated teams around the world and develop advanced technical systems to detect misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community. If we learn of content or conduct like this, we will take appropriate action - for example, offering help, removing content, blocking access to certain features, disabling an account, or contacting law enforcement. We share data with other Facebook Companies when we detect misuse or harmful conduct by someone using one of our Products.

- Use and develop advanced technologies to provide safe and functional services for everyone: We use and develop advanced technologies - such as artificial intelligence, machine learning systems, and augmented reality - so that people can use our Products safely regardless of physical ability or geographic location. For example, technology like this helps people who have visual impairments understand what or who is in photos or videos shared on Facebook or Instagram. We also build sophisticated network and communication technology to help more people connect to the internet in areas with limited access. And we develop automated systems to improve our ability to detect and remove abusive and dangerous activity that may harm our community and the integrity of our Products.

- Research ways to make our services better: We engage in research and collaborate with others to improve our Products. One way we do this is by analyzing the data we have and understanding how people use our Products. You can learn more about some of our research efforts.

- Provide consistent and seamless experiences across the Facebook Company Products: Our Products help you find and connect with people, groups, businesses, organizations, and others that are important to you. We design our systems so that your experience is consistent and seamless across the different Facebook Company Products that you use. For example, we use data about the people you engage with on Facebook to make it easier for you to connect with them on Instagram or Messenger, and we enable you to communicate with a business you follow on Facebook through Messenger.
- Enable global access to our services: To operate our global service, we need to store and distribute content and data in our data centers and systems around the world, including outside your country of residence. This infrastructure may be operated or controlled by Facebook, Inc., Facebook Ireland Limited, or its affiliates.

87.     According to FACEBOOK, "Facebook is a community where everyone uses the name they go by in everyday life. This makes it so that you always know who you're connecting with."

88.     According to FACEBOOK, "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."

89.     According to FACEBOOK's Company Info, FACEBOOK has "1.45 billion daily active users on average for March 2018."

90.     According to FACEBOOK's Company Info, FACEBOOK has "2.20 billion monthly active users as of March 31, 2018."

91.     FACEBOOK's Company info can be found at the following link: https://newsroom.fb.com/company-info/

92.     FACEBOOK's Terms of Service states,  "We help you find and connect with people, groups, businesses, organizations, and others that matter to you..."

93.     FACEBOOK's Terms of Service states, "Our Products help you find and connect with people, groups, businesses, organizations, and others that are important to you."

94.     FACEBOOK's Terms of Service states, "We show you ads, offers, and other sponsored content to help you discover content, products, and services that are offered by the many businesses and organizations that use Facebook and other Facebook Products."

95.     FACEBOOK generates revenue by selling advertising on its social network to Self-Serve Advertisers.

96.     FACEBOOK's Self-Serve Advertisers seek to market their products or digital properties to real people through FACEBOOK through likes and shares on the social network.

97.     The cost of FACEBOOK ads generally range from a few cents to several dollars per click.

98.     More clicks on the ads through likes and shares on FACEBOOK, generates more traffic (GENUINE and FAKE) for the advertisers, resulting in bigger bills for the advertisers, and thus greater revenue for FACEBOOK.

99.     FACEBOOK's Self-Serve Advertisers are interested in increasing genuine traffic from genuine FACEBOOK accounts.

100.   FACEBOOK's Self-Serve Advertisers are not interested in increasing fake traffic from fake FACEBOOK accounts.

101.   Clicks from genuine FACEBOOK accounts generate genuine clicks, or valid clicks.

102.   Clicks from fake FACEBOOK accounts generate fake clicks, or invalid clicks.

103.   FACEBOOK's Self-Serve Advertisers are not obligated to pay for invalid clicks from fake FACEBOOK accounts.

104.   FACEBOOK deleted 583 million fake accounts in the first three months of 2018.

105.   Hence, FACEBOOK acknowledges that they can indeed detect and delete fake accounts through the deployment of not only Artificial Intelligence systems, or click filters, but also by deploying Genuine Intelligence systems, through the utilization of effective policies and procedures and the deployment of an adequate number of competently trained review staff, to not only prevent the creation of fake accounts on their platform, but also to detect and delete fake accounts from their community, as they did during the first three months of 2018.

106.   FACEBOOK can control invalid "Clicks generated trough... fake accounts" simply by detecting and deleting fake accounts through the deployment of not only Artificial Intelligence systems, or click filters, but also by deploying Genuine Intelligence systems, through the utilization of

effective policies and procedures and the deployment of an adequate number of competently  trained review staff, to not only prevent the creation of fake accounts on their platform, but also to detect and delete fake accounts from their community, as they did during the first three months of 2018.

107.    If fake FACEBOOK accounts did not exist on FACEBOOK, there would not be any invalid "clicks generated through... fake accounts."

108.    If you believe FACEBOOK, as stated in the abovementioned article titled "Facebook deleted 583 million fake accounts in the first three months of 2018," FACEBOOK estimates that about 3 percent to 4 percent of the accounts in the FACEBOOK community are fake. Even at that low percentage that results in at least 66 million fake FACEBOOK accounts on their social network.

109.    FACEBOOK has billed Self-Serve Advertisers for fake traffic generated from fake FACEBOOK accounts on their social network.

110.    FACEBOOK overbills Self-Serve Advertisers for fake traffic generated from fake accounts on their social network.

111.    FACEBOOK reported Q1 earnings on Wednesday, April 25, 2018. The company reported profit of $1.69 per share on revenue of $11.97 billion for the quarter, both better than Wall Street estimates.

112.    DOSHIER owns numerous digital properties, including DOTSTRATEGY.

113.    DOSHIER and Class members seek to market their products or

digital properties through Self-Serve ads on FACEBOOK.

114.   Self-Serve Advertisers on FACEBOOK seek to market their product or digital property on FACEBOOK by increasing genuine traffic to their FACEBOOK business pages and/or product specific websites.

115.   DOSHIER and Class members seek to monetize or increase the value of their products or digital properties by increasing genuine traffic to their product specific websites or FACEBOOK business pages through Self-Serve advertising on FACEBOOK.

116.   DOSHIER and Class members seek to increase genuine traffic to their FACEBOOK business pages and/or product specific websites through Self-Serve ads on FACEBOOK.

117.   FACEBOOK is an unregulated monopolistic behemoth in the social media space. If you want to increase the traffic to your FACEBOOK business page and/or product specific website, you have to advertise with FACEBOOK.

118.   As Self-Serve Advertisers, DOSHIER and Class members have purchased ads on FACEBOOK.

119.   DOSHIER and Class members have purchased ads on FACEBOOK for their products or digital properties in order to increase genuine traffic to their  FACEBOOK business pages and/or product specific websites. The value of their products or digital properties increase only if the traffic that is generated through the FACEBOOK ads is genuine traffic from

genuine accounts, not fake traffic from fake accounts.

120.   FACEBOOK misrepresented and continues to misrepresent the actual number of genuine accounts on their social network.

121.   FACEBOOK's Self-Serve Ad Terms state, "8. We do not guarantee the reach or performance that your ads will receive, such as the number of people who will see your ads or the number of clicks your ads will get."

122.   While FACEBOOK does not guarantee "the number of people who will see your ads," they unequivocally represent that ads will be marketed to genuine people with genuine accounts, not fake people with fake accounts.

123.   FACEBOOK's Self-Serve Advertisers like DOSHIER and Class members want to connect to real people with genuine FACEBOOK accounts, not fake people with fake FACEBOOK accounts.

124.   Only real people with authentic identities can open a FACEBOOK account on FACEBOOK.

125.   FACEBOOK "is a community where everyone uses the name they go by in everyday life. This makes it so that you always know who you're connecting with."

126.   FACEBOOK's website states the following:

What names are allowed on Facebook?
https://www.facebook.com/help/112146705538576

Facebook is a community where everyone uses the name they

go by in everyday life. This makes it so that you always know who you're connecting with.

Your name can't include:
- Symbols, numbers, unusual capitalization, repeating characters or punctuation
- Characters from multiple languages
- Titles of any kind (example: professional, religious)
- Words or phrases in place of a name
- Offensive or suggestive words of any kind

If your name follows our standards and you're still having trouble changing it, find out why.

Other things to keep in mind:
- The name on your profile should be the name that your friends call you in everyday life. This name should also appear on an ID or document from our ID list.
- Nicknames can be used as a first or middle name if they're a variation of your authentic name (like Bob instead of Robert).
- You can also list another name on your account (example: maiden name, nickname, professional name).
- Profiles are for individual use only. You can create a Page for a business, organization or idea.
- Pretending to be anything or anyone isn't allowed.

127.   FACEBOOK's Self-Serve Advertisers want to connect with real

people.

128.   FACEBOOK unequivocally represents that the name of a

FACEBOOK account profile is the real name of a real person as it appears on

a real ID or document, such as a birth certificate, a driver's license, or a

passport to name a few.

129.   FACEBOOK's acceptable ID list is found at the following

FACEBOOK website:

What types of ID does Facebook accept?
https://www.facebook.com/help/159096464162185?helpref=fa
q_content

If you need to confirm your name on Facebook or confirm your identity as a Page admin, or if you've lost access to your account, you may be asked to send us a copy of something with your name on it. You have several different options for this, including photo IDs issued by the government, IDs from non-government organizations, official certificates or licenses that include your name or other physical items like a magazine subscription or a piece of mail.

Any time you send us something that confirms your name or identity, please cover up any personal information we don't need to see (ex: credit card number, Social Security number). Also keep in mind that we encrypt everyone's connection to Facebook by default and delete anything that you've sent to us after we've confirmed your name or identity.

Learn more about how Facebook protects the privacy and security of your information when you submit an ID.

Group One
You can send us one of the items from group one to confirm your name or get back into your account. Anything that you send us should contain either your name and date of birth or your name and photo.

- Birth certificate
- Driver's license
- Passport
- Marriage certificate
- Official name change paperwork
- Personal or vehicle insurance card
- Non-driver's government ID (ex: disability, SNAP card, national ID card, pension card)
- Green card, residence permit or immigration papers
- Tribal identification or status card
- Voter ID card
- Family certificate
- Visa
- National age card
- Immigration registration card
- Tax identification card

Group Two

If you don't have anything from group one, you can send us two different items from group two. The name on the items that you send us should be the same name that you want to show on your profile.

Keep in mind that if you've lost access to your account, you may be asked to provide something from the list that also shows a photo or date of birth that matches the details on your Facebook account. This extra precaution is so that we can make sure that the only one with access to your account is you.

- Bank statement
- Transit card
- Check
- Credit card
- Employment verification
- Library card
- Mail
- Magazine subscription stub
- Medical record
- Membership ID (ex: pension card, union membership, work ID, professional ID)
- Paycheck stub
- Permit
- School ID card
- School record
- Social Security card
- Utility bill
- Yearbook photo (actual scan or photograph of the page in your yearbook)
- Company loyalty card
- Contract
- Family registry
- Diploma
- Religious documents
- Certificate of registration for accreditation or professional
- Professional license card
- Polling card
- Health insurance
- Address proof card
- Social welfare card

130.   DOSHIER and Class members have relied upon FACEBOOK's representations that "Facebook is a community where everyone uses the name they go by in everyday life."

131.   DOSHIER and Class members have relied upon FACEBOOK's representations that "Facebook is a community"of real people "where everyone uses the name they go by in everyday life."

132.   DOSHIER and Class members have relied upon FACEBOOK's representations that Self-Serve Ads on FACEBOOK are marketed to real people with authentic IDs and genuine FACEBOOK accounts, and that they wouldn't be charged for "Clicks generated through... fake accounts."

133.   DOSHIER and Class members had a justifiable expectation that their FACEBOOK ads would generate genuine traffic from real people with authentic IDs and genuine FACEBOOK accounts, not fake traffic from fake accounts, and that they wouldn't be charged for "Clicks generated through... fake accounts."

134.   DOSHIER and Class member have relied on FACEBOOK's representation as to the number of genuine accounts in their community.

135.   FACEBOOK represents that genuine traffic will be generated through ads placed on their social network by Self-Serve Advertisers, and that the Self-Serve Advertisers would not be charged for "Clicks generated through... fake accounts."

136.   DOSHIER and Class members expected that their FACEBOOK

ads would generate genuine traffic from genuine accounts, not fake traffic from fake accounts, and that they would not be charged for "Clicks generated through... fake accounts."

137.   DOSHIER and Class members have relied on FACEBOOK's representation that genuine traffic would be generated through ads placed on their social network, and that they would not be charged for "Clicks generated through... fake accounts."

138.   FACEBOOK bills advertisers for the ads that they have placed on FACEBOOK, based upon the number of times that the ads are clicked by FACEBOOK accounts.

139.   FACEBOOK has billed DOSHIER and Class members for the ads that DOSHIER and Class members have placed on FACEBOOK, based upon the number of times that the ads were clicked by FACEBOOK accounts.

140.   FACEBOOK has billed DOSHIER and Class members for invalid "clicks generated through... fake accounts."

141.   FACEBOOK has overbilled DOSHIER and Class members for the ads that DOSHIER and Class members have placed on FACEBOOK.

142.   FACEBOOK continues to overbill DOSHIER and Class members for the ads that DOSHIER and Class members have placed on FACEBOOK, due to invalid"clicks generated through... fake accounts."

143.   DOSHIER and Class members have suffered damages.

144.   FACEBOOK knew or should have known that it has overbilled

and continues to overbill DOSHIER and Class members for fake traffic that is generated from fake accounts on FACEBOOK.

145.   In Paragraph 9 of FACEBOOK's Self-Serve Ad terms, FACEBOOK states, "We have systems that attempt to detect [invalid click activity] and filter certain [invalid] click activity..."

146.   DOSHIER and Class members have relied upon FACEBOOK'S statement, "We have systems that attempt to detect [invalid click activity] and filter certain [invalid] click activity..."

147.   Furthermore, on FACEBOOK's Advertiser Help Center, with regard to the Question, "How does Facebook prevent and detect invalid clicks?," FACEBOOK states, "If we detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid." This text unequivocally supplements the Self-Serve Ad Terms.

148.   Moreover, DOSHIER and Class members have relied upon FACEBOOK'S representation,"If we detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid."

149.   On FACEBOOK's Advertiser Help Center, with regard to invalid clicks, FACEBOOK specifically states the following:

How does Facebook prevent and detect invalid clicks?
https://www.Facebook.com/business/help/211248262238771

We do a few things to reduce the risk of abuse from invalid
clicks and help improve your ad performance like capping the
number of times any ad is shown to a person, regardless of
whether they click on the ad.

There are two different types of clicks we consider invalid:

[1] Clicks from people that don't indicate a genuine interest in
the ad or show signs of ad testing. This includes repetitive or
accidental clicks and visits from the Facebook corporate
network.

[2] Clicks generated through prohibited means, such as fake
accounts, bots, scrapers, browser add-ons or other methods that
don't follow Facebook Terms.

If we detect or are alerted to suspicious or potentially invalid
click activity, a manual review is performed to determine the
nature of the activity. You will not be charged for clicks that are
determined to be invalid.

150.    FACEBOOK clearly defines the term "invalid click" as "clicks

generated through... fake accounts" in the Advertiser Help Center article,

"How does Facebook prevent and detect invalid clicks?"

151.    FACEBOOK also unequivocally states the following in the

Advertiser Help Center article, "How does Facebook prevent and detect

invalid clicks?":

If we detect or are alerted to suspicious or potentially invalid click
activity, a manual review is performed to determine the nature of the
activity. You will not be charged for clicks that are determined to be
invalid.

152.    FACEBOOK's Advertiser Help Center clearly supplements

Paragraph 9 of the Self-Serve Ad Terms with regard to invalid click activity.

153.    Paragraph 9 of the Self-Serve Ad Terms states:

9. We cannot control how clicks are generated on your ads. We have systems that attempt to detect [invalid click activity] and filter certain [invalid] click activity, but we are not responsible for click fraud, technological issues, or other potentially invalid click activity that may affect the cost of running ads.

154.    FACEBOOK's Advertiser Help Center states,

There are two different types of clicks we consider invalid... [2] Clicks generated through prohibited means, such as fake accounts... If we detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid.

155.    Hence, the complete text of FACEBOOK's Advertiser Help Center article, "How does Facebook prevent and detect invalid clicks?" unequivocally supplements the Self-Serve Ad Terms.

156.    The complete text in "How does Facebook prevent and detect invalid clicks?" is incorporated by reference by FACEBOOK in the Self-Serve Ad Terms.

157.    The complete text by FACEBOOK in "How does Facebook prevent and detect invalid clicks?" is incorporated by reference in Paragraph 9 of the Self-Serve Ad Terms through FACEBOOK's use of the terms "clicks"and "invalid click activity" in Paragraph 9 of the Self-Serve Ad Terms, as FACEBOOK defines which "clicks" it considers to be"invalid clicks," and which click activity it considers to be "invalid click activity" in the Advertiser Help Center article, "How does Facebook prevent and detect

invalid clicks?," which is quoted above.

158.     Paragraph 9 of the Sel-Serve Ad Terms state, "We have systems that attempt to detect and filter certain click activity..." Hence, the complete text by FACEBOOK in "How does Facebook prevent and detect invalid clicks?" is also incorporated by reference by FACEBOOK in Paragraph 9 of the Self-Serve Ad Terms with regard to their filter systems, as the Advertiser Help Center article, "How does Facebook prevent and detect invalid clicks?," which is quoted above, states, "If we detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid."

159.     FACEBOOK unequivocally states that Self-Serve Advertisers "will not be charged for clicks that are determined to be invalid."

160.     "Clicks generated through... fake accounts" are invalid clicks as defined by FACEBOOK.

161.     Hence, FACEBOOK unequivocally states that  Self-Serve Advertisers "will not be charged for 'Clicks generated through... fake accounts.'"

162.     The question posed by FACEBOOK, "How does Facebook prevent and detect invalid clicks?," unequivocally implies that FACEBOOK does indeed "prevent and detect invalid clicks."

163.     FACEBOOK represents that it has developed "systems that

attempt to detect and filter certain click activity," or click filters, which have been designed to exclude certain types of clicks, defined as invalid clicks, specifically "clicks generated through ...fake accounts," from the click totals charged to Self-Serve Advertisers.

164.    FACEBOOK unequivocally represents that Self-Serve Advertisers "will not be charged for clicks that are determined to be invalid."

165.    It is on the representations by FACEBOOK in their Self-Serve Ad Terms, which state "We have systems that attempt to detect [invalid click activity] and filter certain [invalid] click activity," and on the representations by FACEBOOK in their Advertiser Help Center concerning "How does Facebook prevent and detect invalid clicks?" that Plaintiffs rely for their claim that Facebook has a uniform contract for Self-Serve Advertisers regarding "valid" clicks and "invalid" clicks, which said contract specifically states, "You will not be charged for clicks that are determined to be invalid."

166.    Plaintiff contracted with FACEBOOK to pay FACEBOOK a fee each time a FACEBOOK user (defined as persons registered with FACEBOOK) clicked on Plaintiff's advertisements in an attempt to view the advertisements. Plaintiff and FACEBOOK regarded such action by a FACEBOOK user to be a valid or "billable click" for which advertisers were contractually obligated to pay FACEBOOK a fee in accordance with the contract.

167.   FACEBOOK, however, systematically fails to limit charges to valid clicks from FACEBOOK users. Instead, Self-Serve Advertisers have been and continue to be unlawfully charged for and presently pay for numerous "invalid clicks," as a result of deficiencies in FACEBOOK's click filters, which has resulted in Self-Serve Advertisers being charged for "Clicks generated through... fake accounts" that FACEBOOK regards as invalid clicks, yet they fail to filter out.

168.   FACEBOOK has consistently represented on its website that it charges advertisers only for valid clicks and that it has measures in place to reduce or eliminate invalid clicks, including but not limited to "Clicks generated through... fake accounts."

169.   Plaintiff reasonably expected, based on FACEBOOK's own statements, that Plaintiff would only be charged for valid clicks and that FACEBOOK would have measures in place to eliminate invalid clicks and would implement procedures to avoid billing for such clicks. Additionally, since the date FACEBOOK began providing advertising services through the present, FACEBOOK has failed to disclose or adequately disclose information, namely, that it does not have the appropriate measures in place to adequately detect and filter, or eliminate, invalid clicks and that it does not implement appropriate policies and procedures to avoid billing for such invalid clicks.

170.   DOSHIER and Class members have relied upon FACEBOOK'S

statement, "You will not be charged for clicks that are determined to be invalid."

171.     Moreover, DOSHIER and Class members have relied upon FACEBOOK'S definition of invalid click activity, including but not limited to "Clicks generated through prohibited means, such as fake accounts."

172.     DOSHIER and Class members have relied upon FACEBOOK'S definition of invalid click activity as "Clicks generated through prohibited means, such as fake accounts, bots, scrapers, browser add-ons or other methods that don't follow Facebook Terms."

173.     DOSHIER and Class members have relied upon FACEBOOK'S statement, "You will not be charged for clicks that are determined to be invalid," specifically "Clicks generated through... fake accounts."

174.     Despite FACEBOOK's representation that "You will not be charged for clicks that are determined to be invalid," specifically "Clicks generated through... fake accounts," FACEBOOK has charged DOSHIER and Class members for "Clicks generated through... fake accounts," which by FACEBOOK's own definition are invalid clicks.

175.     To reiterate, the question posed by FACEBOOK on their website, "How does Facebook prevent and detect invalid clicks?" unequivocally implies that FACEBOOK does indeed "prevent and detect invalid clicks."

176.     DOSHIER and Class members have relied upon FACEBOOK's

statement that they "prevent and detect invalid clicks."

177.   "Clicks generated through... fake accounts," are prohibited. Yet, FACEBOOK has charged DOSHIER and Class members for "Clicks generated through... fake accounts."

178.   DOSHIER and Class members have relied upon FACEBOOK'S statement, "If we detect [invalid click activity] or are alerted to suspicious or potentially invalid click activity [Clicks generated through fake accounts], a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid."

179.   DOSHIER and Class members have relied upon FACEBOOK'S statement, "If we... are alerted to suspicious or potentially invalid click activity [Clicks generated through fake accounts], a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid."

180.   FACEBOOK has misrepresented to DOSHIER and Class members that they "prevent and detect invalid clicks."

181.   FACEBOOK has misrepresented to DOSHIER and Class members that they have "have systems that attempt to detect and filter certain [invalid] click activity," as defined by FACEBOOK as "Clicks generated through... fake accounts."

182.   FACEBOOK either does not "have systems that attempt to detect [invalid click activity] and filter certain [invalid] click activity," as

defined by FACEBOOK as "Clicks generated through... fake accounts," or the systems that they do have "to detect [invalid click activity] and filter certain [invalid] click activity," as defined by FACEBOOK as "Clicks generated through... fake accounts," are grossly inadequate "to detect [Clicks generated through... fake accounts] and filter certain [invalid] click activity," as defined by FACEBOOK as "Clicks generated through... fake accounts."

183.    FACEBOOK has a contractual duty "to detect [invalid click activity] and filter certain [invalid] click activity," as defined by FACEBOOK as "Clicks generated through... fake accounts."

184.    FACEBOOK, either negligently or intentionally, failed to deploy a system to detect and prevent invalid click activity from "Clicks generated through... fake accounts."

185.    FACEBOOK has a contractual duty to perform a manual review if they are alerted to invalid click activity, specifically "Clicks generated through... fake accounts."

186.    DOSHIER has filed this Class Action on behalf of himself and Class members, to alert FACEBOOK "to suspicious or potentially invalid click activity" across the FACEBOOK community for invalid clicks for "Clicks generated through... fake accounts," for which DOSHIER and Class members have been charged, thus unjustly enriching FACEBOOK .

187.    DOSHIER has filed this Class Action on behalf of himself and

Class members, to alert FACEBOOK that they have charged DOSHIER and

Class members for invalid "Clicks generated through... fake accounts" across

the FACEBOOK community.

188.   DOSHIER has filed this Class Action on behalf of himself, and

Class members, and is requesting the court to order FACEBOOK to perform

an Artificial Intelligence review, as well as a Manual review on all of the

FACEBOOK accounts which generated the ad clicks for which DOSHIER has

been charged by FACEBOOK, for all of the ads DOSHIER has placed on

FACEBOOK, in order to objectively determine the extent to which

FACEBOOK charged DOSHIER for invalid "Clicks generated through... fake

accounts," and then to order FACEBOOK to reimburse DOSHIER "for clicks

that are determined to be invalid," specifically "Clicks generated through...

fake accounts," as FACEBOOK has stated "If we... are alerted to suspicious

or potentially invalid click activity [Clicks generated through... fake

accounts], a manual review is performed to determine the nature of the

activity. You will not be charged for clicks that are determined to be invalid."

189.   DOSHIER has filed this Class Action on behalf of himself, and

Class members, and is requesting the court to order FACEBOOK to allow

DOSHIER as Class Representative to participate in FACEBOOK's review of

DOSHIER's ads, in order to objectively determine the extent to which

FACEBOOK has charged DOSHIER for invalid "Clicks generated through...

fake accounts," and then to order FACEBOOK to reimburse DOSHIER "for

clicks that are determined to be invalid [Clicks generated through... fake accounts]," as FACEBOOK has stated "If we... are alerted to suspicious or potentially invalid click activity [Clicks generated through... fake accounts], a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid."

190.    If the review of DOSHIER's ads confirms that he has been charged for "clicks generated through... fake accounts," as Class representative, DOSHIER requests the court to order FACEBOOK to perform an Artificial Intelligence review, as well as a Manual review on all of the FACEBOOK accounts which generated the ad clicks for which Class members have been charged by FACEBOOK, for all of the ads Class members have placed on FACEBOOK, in order to objectively determine the extent to which FACEBOOK has charged Class members for invalid "Clicks generated through... fake accounts," and then to order FACEBOOK to reimburse Class members "for clicks that are determined to be invalid," specifically "Clicks generated through... fake accounts," as FACEBOOK has stated "If we... are alerted to suspicious or potentially invalid click activity [Clicks generated through... fake accounts], a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid."

191.    FACEBOOK, despite having the software coding capability, failed to deploy Artificial Intelligence to detect and filter fake accounts,

because the reduction in FACEBOOK's ad revenue would have been substantial had they detected and filtered "Clicks generated through... fake accounts."

192.   FACEBOOK failed to deploy Genuine Intelligence systems, through the utilization of effective policies and procedures and the deployment of an adequate number of competently trained review staff, to detect and prevent invalid click activity from "Clicks generated through... fake accounts" because the reduction in FACEBOOK's ad revenue would have been substantial had FACEBOOK detected and prevented "Clicks generated through... fake accounts," compared to simply refunding a few cents per click, here and there, to the occasional observant Self-Serve Advertiser who happened to have the wherewithal to notice that FACEBOOK had been charging him for "Clicks generated through... fake accounts."

193.   FACEBOOK failed to deploy systems, as they had represented, to detect and prevent invalid click activity, specifically "Clicks generated through... fake accounts" because of their need to generate more and more ad revenue to satisfy their greed.

194.   FACEBOOK committed widespread fraud across their network by charging DOSHIER and Class members for invalid click activity, specifically "Clicks generated through... fake accounts."

195.   FACEBOOK's internal documents will reveal the extent of their fraud.

196.    FACEBOOK has chosen to look the other way, as their ad revenues have soared, by failing to implement systems to detect and prevent invalid click activity, specifically "Clicks generated through... fake accounts."

197.    FACEBOOK knew of the potential problems with the design of their network, which allowed the prolific creation of fake FACEBOOK accounts across their community.

198.    FACEBOOK knows, and has known, that their community is, and has been, populated by fake FACEBOOK accounts, and that a significant amount of their ad revenue is generated through invalid click activity, specifically "Clicks generated through... fake accounts."

199.    FACEBOOK knows, and has known, that their community is, and has been, populated by fake accounts, and that a significant amount of their ad revenue is generated through invalid click activity, specifically "Clicks generated through... fake accounts," which is why they attempt to disavow any responsibility for the widespread fraud and deception on their platform.

200.    FACEBOOK's statement, "We cannot control how clicks are generated on your ads" is deceptive and disingenuous.

201.    FACEBOOK can indeed control invalid "Clicks generated through... fake accounts" by preventing the creation of the fake accounts on their platform in the first place, as well as by deploying Artificial Intelligence systems, and/or other systems, such as Genuine Intelligence systems,

through the utilization of effective policies and procedures and the deployment of an adequate number of competently trained review staff, to detect and delete the fake accounts from their community, as well as to detect "invalid click activity," specifically "clicks generated through fake accounts," in order to not charge Self-Serve Advertisers for "clicks generated through... fake accounts," or to reimburse Self-Serve Advertisers for such invalid click activity when they have been improperly charged for "clicks generated through... fake accounts".

202.    FACEBOOK represented to DOSHIER and Class members that it was a community of real people, not a community of fake people.

203.    FACEBOOK can indeed detect and filter fake FACEBOOK accounts.

204.    FACEBOOK has only recently deployed an Artificial Intelligence capable of detecting and filtering fake FACEBOOK accounts because of the heightened scrutiny the company has found itself in of late, as was noted in the article titled, "Facebook deleted 583 million fake accounts in the first three months of 2018," which stated as follows:

> Facebook has been dealing with mounting pressure from lawmakers and public opinion over how powerful it's become. In April [2018], CEO Mark Zuckerberg testified before Congress, promising greater transparency and responsibility from the social network. Facebook has gone under intense scrutiny over issues of disinformation campaigns from Russian trolls, as well as a data scandal involving 87 million people. Fake and automated accounts plague other popular services too, including Twitter and YouTube.

49

205.    FACEBOOK should be estopped from attempting to disavow any responsibility and liability for invalid click activity for "Clicks generated through... fake accounts" as FACEBOOK was unjustly enriched by failing to genuinely "attempt to detect and filter certain [invalid] click activity" specifically "Clicks generated through... fake accounts."

206.    FACEBOOK states, "You will not be charged for clicks that are determined to be invalid [Clicks generated through... fake accounts]." Yet, that is indeed what FACEBOOK does.

207.    FACEBOOK is not an innocent party in this matter.

208.    FACEBOOK would be more appropriately named FAKEBOOK.

209.    The NY Times Article, "Facebook Says It's Policing Fake Accounts. But They're Still Easy to Spot," which was published on October 31, 2017, states the following:

> Executives of Facebook, Twitter and Google pledged to Congress this week to do more to prevent the fakery that has polluted their sites. " 'We understand that the people you represent expect authentic experiences when they come to our platform," Colin Stretch, the general counsel of Facebook, told the Senate Intelligence Committee. He said the company was doubling its review staff to 20,000 and using artificial intelligence to find more 'bad actors.'

210.    FACEBOOK is not innocent in this matter. FACEBOOK is the "bad actor" in this matter.

211.    DOSHIER and Class members are genuine members of the FACEBOOK community.

212.    FACEBOOK  failed to protect DOSHIER and Class members

from fake FACEBOOK accounts.

213.   FACEBOOK could have deployed 20,000 competently trained review staff a long time ago to detect and prevent the deception, fraud, and invalid click activity from the fake accounts, which populate its community. But, FACEBOOK  chose not to.

214.   The NY Times Article, "Facebook Says It's Policing Fake Accounts. But They're Still Easy to Spot," which was published on October 31 2017, further states, "Despite months of talk about the problem of fraud facing Facebook and other tech companies, and vows to root it out, their sites [FACEBOOK] remain[s] infected by obvious counterfeits."

215.   The NY Times Article, "Facebook Says It's Policing Fake Accounts. But They're Still Easy to Spot," which was published on October 31 2017, also states "The Russian influence operation during the 2016 election, which occasioned the three congressional hearings this week, is only one especially consequential sample of a far larger problem, in which the platforms [FACEBOOK] are gamed for profit or political influence."

216.   Yet, DOSHIER and Class members have been gamed for profit by FACEBOOK, as FACEBOOK failed to deploy a system "to detect and filter certain [invalid] click activity" specifically "Clicks generated through… fake accounts," which were created using FACEBOOK's very own platform.

217.   DOSHIER and Class members have been gamed for profit by FACEBOOK, as FACEBOOK charged them for "Clicks generated through…

fake accounts," which is invalid click activity as defined by FACEBOOK.

218.    The NY Times Article, "Facebook Says It's Policing Fake

Accounts. But They're Still Easy to Spot," which was published on October

31, 2017, goes on to state:

> With more than two billion users worldwide, Facebook relies on
> complaints to police its content. So, Mr. Elwood used
> Facebook's internal complaint tool to report the Keven Eversley
> [FAKEBOOK ACCOUNT] profile and 27 others showing evidence
> of deception. In all but a couple of cases, Facebook responded
> with a standard message of thanks for the feedback but said the
> profiles did not violate its community standards — even though
> those standards require users to give their "authentic identities.

219.    FACEBOOK failed to detect and prevent fake accounts from

populating and persisting in their very own community.

220.    FACEBOOK failed to follow their own standards and allowed

fake people, fake accounts, to populate and persist in their community.

221.    FACEBOOK violated their own identity standards and charged

DOSHIER and Class members for invalid click activity from fake accounts on

their platform.

222.    The NY Times Article, "Facebook Says It's Policing Fake

Accounts. But They're Still Easy to Spot," which was published on October

31 2017, continues, "'The reporting process is frustrating,' Mr. Elwood said.

'Facebook seems to be lagging way behind the problem.' Facebook

estimates that as many as 60 million accounts, 2 to 3 percent of the

company's 2.07 billion regular visitors, are fakes."

223.    FACEBOOK has unjustly enriched itself, to the detriment of

DOSHIER and Class members, as it has ignored its own identity standards and allowed fake people, fake accounts, to populate their platform.

224.    DOSHIER and Class members are relying upon FACEBOOK'S statement, "If we...are alerted to suspicious or potentially invalid click activity [Clicks generated through fake accounts], a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid."

225.    DOSHIER became aware of the widespread extent that fake accounts populate the FACEBOOK platform when FACEBOOK admitted that they deleted 583 million fake accounts in the first three months of 2018.

226.    DOSHIER has placed 55 ads on FACEBOOK for DOTSTRATEGY.

227.    DOSHIER performed a limited manual review of the ads that he placed on FACEBOOK.

228.    FACEBOOK has not provided all of the click data to DOSHIER for all of the charges that were invoiced to DOSHIER for all of the ads he placed on FACEBOOK, thus limiting his ability to review his account with FACEBOOK.

229.    FACEBOOK has not provided true transparency for all charges invoiced to DOSHIER for ads placed on FACEBOOK, thus limiting his ability to review his account with FACEBOOK.

230.    DOSHIER placed 55 ads on FACEBOOK from 12/26/13 to the

present.

231.    Of the 55 ads that DOSHIER placed on FACEBOOK from

12/26/13 to the present, FACEBOOK provided data on only 39 of the ads.

232.    With regard to spotting a fake account on FACEBOOK, the

process is simple.

233.    The NY Times Article, "Facebook Says It's Policing Fake

Accounts. But They're Still Easy to Spot," which was published on October

31, 2017, states there are red flags with regard to spotting fake accounts on

FACEBOOK:

> Red Flags: How to Spot Fake Content
>
> •    Check out who a profile is "friends" with. Is the hometown
> listed on a profile similar to its friend base? For example, "Keven
> Eversley" claims to be from Minneapolis, but the majority of his
> friends are from Skopje, Macedonia.
>
> •    Compare the profile's public name to its web address. For
> the Eversley profile, it has a different name in the address:
> Aleksandar Teovski.
>
> •    If a profile seems suspicious, search for similar pages that
> draw on the same personal details or images.

234.    A manual review to determine whether a FACEBOOK account,

which generated an ad click for which DOSHIER and Class members has

been charged, is a fake account or not is a simple but extremely time

consuming process.

235.    A manual review to determine whether clicks are invalid "Clicks

generated through... fake accounts," which is invalid click activity as defined

by FACEBOOK,  is a simple but extremely time consuming process.

236.    Based upon a limited red flag manual review of just some of the click data provided to him by FACEBOOK, DOSHIER has determined that an overwhelming percentage of the accounts which generated clicks that FACEBOOK charged him for were fake FACEBOOK accounts.

237.    Based upon DOSHIER's limited red flag manual review of his FACEBOOK ads, DOSHIER estimates that 20% of the clicks that he was charged for by FACEBOOK were "Clicks generated through... fake accounts."

238.    Based upon DOSHIER's limited red flag manual review of his FACEBOOK ads, DOSHIER estimates 20% of the clicks that Class members were charged for by FACEBOOK will also be determined to be "Clicks generated through... fake accounts."

239.    DOSHIER has spent a total of $8104.12 on FACEBOOK ads.

240.    The NY Times Article, "Facebook Says It's Policing Fake Accounts. But They're Still Easy to Spot," which was published on October 31, 2017, further states:

> Part of the problem is that Facebook is a black box," said Michael Serazio, a professor of communications at Boston College. "They do what they do, and we don't know to what degree their operations can even handle these issues — not to mention how handling them maps with their economic model. In fact, fighting too hard against deception may clash with the business models that have allowed the companies to thrive. Facebook, Google and Twitter all offer self-serve advertising systems allowing anyone in the world to buy, target and deliver ads for as much — or as little — money as they wish to spend.

More scrutiny could hamper growth. Facebook, for instance, reported record profits this week in its quarterly earnings even as executives testified about Russian exploitation of their services. Shares of the social network soared to an all-time high on Wednesday afternoon after the news. Mark Zuckerberg, Facebook's chief executive, insisted in the earnings call that the company is prepared to sacrifice profits to crack down on illicit activity. "Protecting our community is more important than maximizing our profits," he [Mark Zuckerberg] said.

241.    If protecting the FACEBOOK community, which includes DOSHIER and Class members, is indeed more important than maximizing FACEBOOK profits, as Mark Zuckerberg has claimed, then FACEBOOK shouldn't object to the court granting relief to DOSHIER and the Class members.

242.    DOSHIER has filed this Class Action on behalf of himself and Class members, to request the court to protect DOSHIER and Class members from FACEBOOK.

243.    DOSHIER has filed this Class Action on behalf of himself and Class members, to alert FACEBOOK "to suspicious or potentially invalid click activity" for "Clicks generated through... fake accounts" across the FACEBOOK platform, for which DOSHIER and Class members have been wrongfully charged, thus unjustly enriching FACEBOOK .

244.    FACEBOOK has a duty to perform manual reviews if they are alerted to invalid click activity, specifically "Clicks generated through... fake accounts."

245.    The NY Times Article, "Facebook Says It's Policing Fake

Accounts. But They're Still Easy to Spot," which was published on October

31, 2017, states:

> Executives of Facebook, Twitter and Google pledged to Congress this
> week to do more to prevent the fakery that has polluted their sites.
> "We understand that the people you represent expect authentic
> experiences when they come to our platform," Colin Stretch, the
> general counsel of Facebook, told the Senate Intelligence Committee.
> He said the company was doubling its review staff to 20,000 and
> using artificial intelligence to find more "bad actors".

246.    According to FACEBOOK's General Counsel, Colin Stretch, in

his testimony before the Senate Intelligence Committee, FACEBOOK "was

doubling its review staff to 20,000 and using artificial intelligence to find

more 'bad actors.'"

247.    DOSHIER has filed this Class Action on behalf of himself, and

Class members, and is requesting the court to order FACEBOOK to utilize

their artificial intelligence, and their review staff of 20,000, to perform

automated and manual  reviews on all of the ads DOSHIER and Class

members have placed on FACEBOOK.

248.    The methodology that DOSHIER requests the court to order will

not necessarily require an analysis of every single FACEBOOK account that

generated ad clicks for every single ad for which DOSHIER and Class

members have been charged by FACEBOOK, as it will become clear that a

bell curve of fake FACEBOOK accounts will be established across the class.

249.    DOSHIER has filed this Class Action on behalf of himself, and

Class members, and is requesting the court to order FACEBOOK to reimburse

DOSHIER and Class members "for clicks that are determined to be invalid [Clicks generated through... fake accounts]," as FACEBOOK has stated "If we... are alerted to suspicious or potentially invalid click activity [Clicks generated through... fake accounts], a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid."

250.    To date, FACEBOOK has failed to deploy a system to detect and prevent invalid click activity from "Clicks generated through... fake accounts" because the reduction in ad revenue would be substantial.

251.    FACEBOOK was either negligent or they intentionally committed widespread fraud by failing to implement either an Artificial Intelligence system, or a Genuine Intelligence system through the utilization of effective policies and procedures and the deployment of an adequate number of competently trained review staff, to detect and prevent "unauthentic identities" from creating fake accounts, as well as to detect and prevent invalid "clicks generated through... fake accounts,"such as by simply detecting and deleting fake accounts from their community.

252.    DOSHIER asks the court to appoint him as Class Representative.

253.    DOSHIER asks the court to certify this matter as a Class Action.

254.    DOSHIER has a workable methodology for defining with

precision the types of clicks that qualify as "invalid" and for determining on a classwide basis whether, and to what extent, putative class members were charged for such clicks.

255.    FACEBOOK has defined "Clicks generated through... fake accounts" as invalid clicks. Specifically, FACEBOOK states, "There are two different types of clicks we consider invalid: Clicks from people that don't indicate a genuine interest in the ad or show signs of ad testing. This includes repetitive or accidental clicks and visits from the Facebook corporate network. Clicks generated through prohibited means, such as fake accounts, bots, scrapers, browser add-ons or other methods that don't follow Facebook Terms."

256.    To simplify the issue in this matter, Plaintiff is limiting the definition of invalid clicks to "Clicks generated through... fake accounts."Hence, DOSHIER has defined with precision the types of clicks that qualify as invalid fr the purpose of this class action lawsuit.

257.    The methodology to determine whether the clicks were "Clicks generated through... fake accounts," which is the issue in this matter, is the same across the class.

258.    The Plaintiff's methodology to determine on a classwide basis whether, and to what extent, putative class members were charged for "clicks generated through... fake accounts" involves nothing more than what FACEBOOK should have been doing all along, and that is to deploy an

automated and manual review of the FACEBOOK accounts which generated the ad clicks for which each Class member was charged by FACEBOOK, to determine whether the FACEBOOK accounts which generated the ad clicks for which each Class member was charged by FACEBOOK, were fake or not.

259.   Based upon the fact that FACEBOOK detected and deleted 583 million fake accounts in the first three months of 2018 it is evident that this methodology can be employed in this case.

260.   Any click which is determined to have been generated through a fake account is an "invalid click" for which Facebook would be prohibited from charging under Plaintiffs' theory of the contractual relationship between Plaintiffs as Self Serve Advertisers, and FACEBOOK.

270.   FACEBOOK has a list of all of the Self-Serve Ad customers like DOSHIER.

271.   All of the Self-Serve Ad customers like DOSHIER have the exact same kind of "click data" as DOSHIER.

272.   FACEBOOK has in its possession all of the "click data" for all of the Self-Serve Ads that DOSHIER and Class members have placed on FACEBOOK.

273.   In addition to the number of clicks that an ad generated for which each class member was charged by FACEBOOK, FACEBOOK will have the actual FACEBOOK account links which generated the ad clicks for which each class member was charged by FACEBOOK.

274.   DOSHIER's methodology can determine on a classwide basis whether, and to what extent, putative class members were charged for "clicks generated though... fake accounts" by analyzing the data provided by FACEBOOK.

275.   DOSHIER's methodology can determine on a classwide basis whether, and to what extent, putative class members were charged for "clicks generated though... fake accounts" by reviewing the account links tied to accounts that have generated ad clicks for which each Class member was charged by FACEBOOK. If the account which generated the ad click is determined to be fake, then Class members will be confirmed to have been charged by FACEBOOK for an invalid click linked to this fake account.

276.   DOSHIER's methodology to determine fake accounts will consist of an automated component and a manual component.

277.   The automated component will be used to filter the data to identify those accounts that are more likely than not fake accounts.

278.   The manual component is a necessary component to the methodology. This is attested to by the fact that FACEBOOK has increased its review staff to 20,000. The manual component will be deployed after the automated component to verify whether the accounts identified by automated component are indeed fake.

279.   DOSHIER's methodology to determine on a classwide basis whether, and to what extent, putative class members were charged for

"clicks generated through... fake accounts" involves nothing more than what FACEBOOK should have been doing all along. FACEBOOK could and should have deployed an automated and manual review of the FACEBOOK accounts which generated the ad clicks for which each Class member was charged by FACEBOOK, to determine whether the accounts were fake or not before they charged DOSHIER and Class members for the ad clicks from those FACEBOOK accounts.

280.    Damages can be determined on a class-wide basis using this automated and manual review methodology to confirm ad clicks generated from fake accounts.

281.    The fact that FACEBOOK detected and deleted 583 million fake accounts in the first three months of 2018 proves that they have systems in place to conduct this kind of review.

282.    As the "bad actor" and sole repository of the data required to establish liability in this matter, FACEBOOK should be made to bear the cost of all actions associated with validating accounts in the manner described herein, including, but not limited to, manpower utilization and verification procedures, either automated or manual.

## CLASS ACTION - ARCP 23

283.    Arkansas Rules Of Civil Procedure 23 provides that the prerequisites to a Class Action are: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact

common to the class, (3) the claims or defenses of the representative parties

are typical of the claims or defenses of the class, and (4) the representative

parties will fairly and adequately protect the interests of the class.

284.    The preceding paragraphs of this Complaint are realleged and

incorporated by reference as if fully set forth herein.

285.    Pursuant to ARCP 23 Plaintiff, individually and on behalf of all

others similarly situated, brings this lawsuit on behalf of themselves and as a

class action on behalf of the following Class: All persons and/or entities

within the United States who entered into Self-Service Advertising

agreements with Facebook, Inc. and who were subsequently charged by the

Defendant for invalid clicks, defined as "clicks generated through… fake

accounts."

286.    The following persons and/or entities are excluded from the

Class:

a. Persons and/or entities who timely opt-out of this proceeding using

the correct protocol for opting-out that will be formally established by

this court;

b. Any and all federal, state, and/or local governments, including, but

not limited to, their departments, agencies, divisions, bureaus, boards,

sections, groups, counsels, and/or subdivisions;

c. Any currently sitting Arkansas state court judge and/or justice in the

current style and/or any persons within the third degree of

consanguinity to such judge and/or justice; and

d. Any person or entity who has filed a lawsuit against Defendants for overcharging for invalid clicks.

287.     This court should find that a class action is maintainable because the requirements to ARCP 23 (a) are met by the class; that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

288.     This matter should be certified as a class action by the Circuit Court of Faulkner County Arkansas.

289.     Plaintiffs should be awarded attorneys fees pursuant A.C.A. 4-88-113 (f) and A.C.A. 16-22-308

290.     All of the causes of action of the Plaintiffs herein occurred and are operative subsequent to February 18th, 2005. The causes of action herein are subsequent to the effective date of the Class Action Fairness Act (C.A.F.A.), Pub. L. No. 109-2.

291.     Numerosity: The members of each Class are so numerous that joinder of all members of any Class would be impracticable. Plaintiff reasonably believes that Class members number in the 10s of millions of people or more in the aggregate. The names and addresses of Class members are identifiable through documents maintained by Defendants.

292.   Commonality and Predominance: This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

a. Whether and to what extent FACEBOOK billed Plaintiff and Class members for "clicks generated through fake accounts";

b. Whether Defendant's conduct violated § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, et seq.;

c. Whether Defendant's conduct violated the Deceptive Trade Practices Act {A.C.A. 4-88-107 (a ) (1)};

d. Whether Defendant's conduct violated the Unfair Practices Act {A.C.A. 4-75-201 et seq};

e. Whether Defendant violated Arkansas Common Law for Fraud and Deceit;

f. Whether Defendant breached their advertising Contract with Plaintiff and Class members;

g. Whether FACEBOOK misrepresented and continues to misrepresent that they have systems that to detect and filter invalid click activity;

h. Whether Plaintiff and Class members' detrimentally relied upon Defendant's representations they have systems to detect and filter invalid click activity;

I. Whether FACEBOOK misrepresented and continues to misrepresent that if they detect or are alerted to suspicious or potentially invalid

click activity, a manual review is performed to determine the nature of the activity.

j. Whether Plaintiff and Class members' detrimentally relied upon Defendant's representations that if they detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity.

k. Whether FACEBOOK misrepresented and continues to misrepresent that Self-Serve Advertisers will not be charged for clicks that are determined to be invalid;

l. Whether Plaintiff and Class members' detrimentally relied upon Defendant's representations that Self-Serve Advertisers will not be charged for clicks that are determined to be invalid;

m.    Whether FACEBOOK misrepresented and continues to misrepresent that ads placed on their social network, or the FACEBOOK website would be marketed to real people;

n. Whether Plaintiff and Class members detrimentally relied upon Defendant's representations that ads placed on their social network, or the FACEBOOK website would be marketed to real people with genuine accounts;

o. Whether FACEBOOK misrepresented and continues to misrepresent that "Facebook is a community where everyone uses the name they go by in everyday life. This makes it so that you always know who you're

connecting with."

p. Whether Plaintiff and Class members' detrimentally relied upon
Defendant's representations that "Facebook is a community where
everyone uses the name they go by in everyday life. This makes it so
that you always know who you're connecting with."

q. Whether FACEBOOK knowingly made false representations and
continues to make false representations about the number of genuine
accounts, or real people on the social network, or FACEBOOK
community;

r. Whether Plaintiff and Class members' detrimentally relied upon
Defendant's representations about the number of genuine accounts, or
real people on the social network, or FACEBOOK community;

s. Whether FACEBOOK knowingly made false representations and
continues to make false representations that ads placed on the social
network would be marketed to genuine accounts, or real people on the
social network, or FACEBOOK community;

t. Whether Plaintiff and Class members' detrimentally relied upon
Defendant's representations that ads placed on the social network
would be marketed to genuine accounts, or real people on the social
network, or FACEBOOK community;

u. Whether Defendant was Unjustly Enriched at Plaintiff's and Class
members' expense;

v. Whether Plaintiff and the Class are entitled to equitable relief,

including, but not limited to, injunctive relief and restitution; and

w. Whether Plaintiff and the other Class members are entitled to

actual, statutory, or other forms of damages, and other monetary

relief.

293.    Defendant engaged in a common course of conduct giving rise

to the legal rights sought to be enforced by Plaintiff individually and on

behalf of the members of the class. Similar or identical statutory and

common law violations, business practices, and injuries are involved.

Individual questions, if any, pale by comparison, in both quantity and quality,

to the numerous common questions that dominate this action.

294.    Typicality: Plaintiff's claims are typical of the claims of the

other members of their respective classes because, among other things,

Plaintiff and the other class members were injured through the substantially

uniform misconduct of Defendants. Plaintiff is advancing the same claims

and legal theories on behalf of himself and all other Class members, and

there are no defenses that are unique to Plaintiff. The claims of Plaintiff and

hose of other Class members arise from the same operative facts and are

based on the same legal theories.

295.    Adequacy of Representation: Plaintiff is an adequate

representative of the class because his interests do not conflict with the

interests of the other Class members he seeks to represent; he has retained

counsel competent and experienced in complex class action litigation and

Plaintiff will prosecute this action vigorously. The Class members' interests

will be fairly and adequately protected by Plaintiff and his counsel.

296.    Superiority: A class action is superior to any other available

means for the fair and efficient adjudication of this controversy, and no

unusual difficulties are likely to be encountered in the management of this

matter as a class action. The damages, harm, or other financial detriment

suffered individually by Plaintiff and the other members of their respective

classes are relatively small compared to the burden and expense that would

be required to litigate their claims on an individual basis against Defendant,

making it impracticable for Class members to individually seek redress for

Defendant's wrongful conduct. Even if Class members could afford individual

litigation, the court system could not. Individualized litigation would create a

potential for inconsistent or contradictory judgments, and increase the delay

and expense to all parties and the court system. By contrast, the class action

device presents far fewer management difficulties and provides the benefits

of single adjudication, economies of scale, and comprehensive supervision by

a single court.

297.    Further, Defendant has acted or refused to act on grounds

generally applicable to the Class and, accordingly, final injunctive or

corresponding declaratory relief with regard to the members of the Class as a

whole is appropriate under Rule 23(b) of the Arkansas Rules of Civil

Procedure.

298.    Likewise, particular issues under Rule 23(b) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether and to what extent FACEBOOK billed Plaintiff and Class members for "clicks generated through fake accounts";

b. Whether (and when) FACEBOOK knew that fake accounts were generating fake traffic for ads placed on the social network, or FACEBOOK community;

c. Whether (and when) FACEBOOK knew that it had a substantial number of fake accounts on the social network, or FACEBOOK community;

d. Whether (and when) FACEBOOK knew that its systems, or click filters, were failing to prevent the creation of fake accounts on the social network, or FACEBOOK community;

e. Whether (and when) FACEBOOK knew that its systems, or click filters, were failing to detect fake accounts on the social network, or FACEBOOK community;

f. Whether FACEBOOK knew (and when) that ads placed on the social network, or FACEBOOK community, were generating substantial

revenue for the company through "clicks generated through fake

accounts";

g. Whether FACEBOOK failed to comply with its own policies and

applicable laws, regulations, and industry standards relating to unfair

and deceptive trade practices;

h. Whether FACEBOOK knowingly made false representations and

continues to make false representations about the number of genuine

accounts, or real people on the social network, or FACEBOOK

community;

I. Whether FACEBOOK knowingly made false representations and

continues to make false representations that ads placed on the social

network would be marketed to genuine accounts, or real people on the

social network, or FACEBOOK community; and

j. Whether Defendant's acts, omissions, misrepresentations, and

practices were and are likely to deceive consumers.

299.    Plaintiff and Class members allege and contend that they have

suffered damages.

## FIRST CLAIM FOR RELIEF

### Violations of the Deceptive Trade Practices Act
### {A.C.A. 4-88-107 (a ) (1)}

300.    The preceding paragraphs of this Complaint are realleged and

incorporated by reference as if fully set forth herein.

Deceptive and unconscionable trade practices made unlawful and

prohibited by this chapter include, but are not limited to, the following:

a. FACEBOOK knowingly made false representations and continues to

make false representations about the number of genuine accounts, or

real people on the social network, or FACEBOOK community.

b. FACEBOOK misrepresented and continues to misrepresent that they

have systems to detect and filter invalid click activity;

c. FACEBOOK misrepresented and continues to misrepresent that they

have systems to detect and filter invalid "clicks generated through fake

accounts";

d. FACEBOOK misrepresented and continues to misrepresent that if

they detect or are alerted to suspicious or potentially invalid click

activity, a manual review is performed to determine the nature of the

activity.

e. FACEBOOK misrepresented and continues to misrepresent that Self-

Serve Advertisers will not be charged for clicks that are determined to

be invalid;

f. FACEBOOK misrepresented and continues to misrepresent that ads

placed on their social network, or the FACEBOOK website would be

marketed to real people;

g. FACEBOOK misrepresented and continues to misrepresent that

"Facebook is a community where everyone uses the name they go by

in everyday life. This makes it so that you always know who you're connecting with."; and

h. Whether FACEBOOK knowingly made false representations and continues to make false representations that ads placed on the social network would be marketed to genuine accounts, or real people on the social network, or FACEBOOK community.

301.    FACEBOOK billed Plaintiff and Class members for "clicks generated through fake accounts."

## SECOND CLAIM FOR RELIEF

### Violations of the Unfair Practices Act {A.C.A. 4-75-201 et seq}

302.    The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

303.    The purpose (A.C.A. 4-75-202) of the Unfair Practices Act is set out as follows: The General Assembly declares that the purpose of this subchapter is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented.

304.    FACEBOOK is a monopolistic behemoth in the social network space.

## THIRD CLAIM FOR RELIEF

### Violations of Arkansas Common Law for Fraud and Deceit

305.    The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

306.    This is a claim for damages based upon deceit in accordance with the requirements of AMI 402 and the Plaintiff and Class members contend that they have sustained damages, that there was a false representation of a material fact made by FACEBOOK, that FACEBOOK either knew that the representation was false or that FACEBOOK did not have a sufficient basis of information to make the representation, that FACEBOOK intended to induce the Plaintiff and Class members to act or refrain from acting in reliance upon the misrepresentation, and that the Plaintiff and Class members justifiably relied upon the representation in acting or refrain from acting and as a result sustained damages.

## FOURTH CLAIM FOR RELIEF

## CONTRACT LAW

307.    The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

308.    This is a claim of breach of contract on the part of FACEBOOK.

309.    Plaintiff and Class members contend that there was an agreement and that the Plaintiff and Class members relied upon the agreement and there were definite terms for the agreement and as a result of the breach of the agreement by FACEBOOK the Plaintiff and Class members have suffered damages.

310.   It is on the representations by FACEBOOK in their Self-Serve Ad Terms, which state "We have systems that attempt to detect and filter certain click activity," and on the representations by FACEBOOK in their Advertiser Help Center concerning "How does Facebook prevent and detect invalid clicks?" that Plaintiffs rely for their claim that Facebook has a uniform contract for Self-Serve Advertisers regarding "valid" clicks and "invalid" clicks, which said contract specifically states, "You will not be charged for clicks that are determined to be invalid."

311.   It is on the representations by FACEBOOK in their Self-Serve Ad Terms, which state "We have systems that attempt to detect and filter certain click activity," and on the representations by FACEBOOK in their Advertiser Help Center concerning "How does Facebook prevent and detect invalid clicks?" which states, "There are two different types of clicks we consider invalid... [2] Clicks generated through prohibited means, such as fake accounts... If we detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid," that Plaintiffs rely for their claim that Facebook has a uniform contract for Self-Serve Advertisers regarding "valid" clicks and "invalid" clicks, which said contract specifically states, "You will not be charged for clicks that are determined to be invalid."

312.   Plaintiff contracted with FACEBOOK to pay FACEBOOK a fee

each time a FACEBOOK user (defined as persons registered with

FACEBOOK) clicked on Plaintiff's advertisements in an attempt to view the

advertisements. Plaintiff and FACEBOOK regarded such action by a

FACEBOOK user to be a valid or "billable click" for which advertisers were

contractually obligated to pay FACEBOOK a fee in accordance with the

contract.

313.    FACEBOOK, however, systematically fails to limit charges to

valid clicks from genuine FACEBOOK users. Instead, Self-Serve Advertisers

have been and continue to be unlawfully charged for and presently pay for

numerous "invalid clicks," as defined by FACEBOOK as "Clicks generated

through... fake accounts," that FACEBOOK regards as "invalid clicks," yet

they fail to filter them out.

314.    FACEBOOK has consistently represented on its website that it

charges advertisers only for valid clicks and that it has measures in place to

reduce or eliminate invalid clicks, including but not limited to "Clicks

generated through... fake accounts."

315.    Self-Serve Advertisers have been and continue to be unlawfully

charged for and presently pay for numerous "invalid clicks" despite

FACBOOK's representation that they "will not be charged for clicks that are

determined to be invalid."

316.    FACEBOOK breached its contract with Plaintiff and Class

members as it has charged them for "clicks generated through... fake

accounts."

## FIFTH CLAIM FOR RELIEF

## PROMISSORY ESTOPPEL

317.    The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

318.    This is a claim of promissory estoppel.

319.    FACEBOOK knowingly made false representations and continues to make false representations, including but not limited to the following:

a. FACEBOOK knowingly made false representations and continues to make false representations about the actual number of genuine accounts, or real people on the social network, or FACEBOOK community.

b. Plaintiff and Class members' detrimentally relied upon Defendant's representations about the amount of genuine accounts, or real people on the social network, or FACEBOOK community.

c. FACEBOOK misrepresented and continues to misrepresent that they have systems that to detect and filter invalid click activity.

d. Plaintiff and Class members' detrimentally relied upon Defendant's representations that they have systems to detect and filter invalid click activity.

e. FACEBOOK misrepresented and continues to misrepresent that they

have systems to detect and filter invalid "clicks generated through fake accounts."

f. Plaintiff and Class members' detrimentally relied upon Defendant's representations that they have systems to detect and filter invalid "clicks generated through fake accounts."

g. FACEBOOK misrepresented and continues to misrepresent that if they detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity.

h. Plaintiff and Class members' detrimentally relied upon Defendant's representations that if they detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity.

I. FACEBOOK misrepresented and continues to misrepresent that Self-Serve Advertisers will not be charged for clicks that are determined to be invalid.

j. Plaintiff and Class members' detrimentally relied upon Defendant's representations that Self-Serve Advertisers will not be charged for clicks that are determined to be invalid.

k. FACEBOOK misrepresented and continues to misrepresent that ads placed on their social network, or the FACEBOOK community would be marketed to real people.

l. Plaintiff and Class members' detrimentally relied upon Defendant's representations that ads placed on their social network, or the FACEBOOK community would be marketed to real people.

m. FACEBOOK misrepresented and continues to misrepresent  that "Facebook is a community where everyone uses the name they go by in everyday life. This makes it so that you always know who you're connecting with."

n. Plaintiff and Class members' detrimentally relied upon Defendant's representations "Facebook is a community where everyone uses the name they go by in everyday life. This makes it so that you always know who you're connecting with."

320.    FACEBOOK billed Plaintiff and Class members for "clicks generated through fake accounts."

## SIXTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

321.    The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

322.    FACEBOOK has been, and will continue to be unjustly enriched at the expense of Plaintiff and Class members.

323.    FACEBOOK has been unjustly enriched by their receipt of monies received from Self-Serve Advertisers who purchased ads, based upon misrepresentations by FACEBOOK, including but not limited to the following

misrepresentations:

> a. FACEBOOK has been unjustly enriched by their receipt of monies received from Self-Serve Advertisers who purchased ads, based upon misrepresentations by FACEBOOK that the ads would be marketed to genuine accounts, or real people on the social network, or FACEBOOK community.
>
> b. Plaintiff and Class members' detrimentally relied upon Defendant's representations that their ads would be marketed to genuine accounts, or real people on the social network, or FACEBOOK community.
>
> c. FACEBOOK has been unjustly enriched by their receipt of monies received from Self-Serve Advertisers to which defendant is not entitled because of its misrepresentation of the amount of genuine accounts, or real people on the social network, or FACEBOOK community.
>
> d. Plaintiff and Class members' detrimentally relied upon Defendant's representations about the amount of genuine accounts, or real people on the social network, or FACEBOOK community.
>
> e. FACEBOOK has been unjustly enriched by their receipt of monies received from Self-Serve Advertisers to which defendant is not entitled because of its misrepresentation that they have systems that to detect and filter invalid click activity.
>
> f. Plaintiff and Class members' detrimentally relied upon Defendant's

representations that they have systems that to detect and filter invalid click activity.

g. FACEBOOK has been unjustly enriched by their receipt of monies received from Self-Serve Advertisers  to which defendant is not entitled because of its misrepresentation that they have systems to detect and filter invalid "clicks generated through fake accounts."

h. Plaintiff and Class members' detrimentally relied upon Defendant's representations that they have systems to detect and filter invalid "clicks generated through fake accounts."

i. FACEBOOK misrepresented and continues to misrepresent that if they detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity.

j. Plaintiff and Class members' detrimentally relied upon Defendant's representations that if they detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity.

k. FACEBOOK misrepresented and continues to misrepresent that Self-Serve Advertisers would not be charged for clicks that are determined to be invalid.

l. Plaintiff and Class members' detrimentally relied upon Defendant's representations that Self-Serve Advertisers would not be charged for

clicks that are determined to be invalid.

m. FACEBOOK misrepresented and continues to misrepresent that ads placed on their social network, or the FACEBOOK community would be marketed to real people.

n. Plaintiff and Class members' detrimentally relied upon Defendant's representations that ads placed on their social network, or the FACEBOOK community would be marketed to real people.

o. FACEBOOK misrepresented and continues to misrepresent  that "Facebook is a community where everyone uses the name they go by in everyday life. This makes it so that you always know who you're connecting with."

p. Plaintiff and Class members' detrimentally relied upon Defendant's representations "Facebook is a community where everyone uses the name they go by in everyday life. This makes it so that you always know who you're connecting with."

324.    Plaintiff and Class members did not always know who they were connecting with on the social network, or FACEBOOK community.

325.    FACEBOOK billed Plaintiff and Class members for "clicks generated through fake accounts."

## SEVENTH CLAIM FOR RELIEF

### Fixing Prices or Quantities of Products
### {A.C.A. Sec. 4-75-309}

326.    The preceding paragraphs of this Complaint are realleged and

incorporated by reference as if fully set forth herein.

327.   A.C.A. Sec. 4-75-309 states, in pertinent part:

Any corporation organized under the laws of this or any other state or country and transacting or conducting any kind of business in this state, or any partnership or individual, or other association or persons whatsoever, who is, or creates, enters into, or becomes a member of, or a party to, any pool, trust, agreement, combination, confederation, or understanding, whether it is made in this state or elsewhere, with any other corporation, partnership, individual, or any other person or association of persons, to regulate or fix, either in this state or elsewhere, the price of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or the price or premium to be paid for insuring property against loss or damage by fire, lightning, or tornado, or to maintain the price when so regulated or fixed, or who is, or enters into, or becomes a member of, or a party to any pool, agreement, contract, combination, association, or confederation, whether made in this state or elsewhere, to fix or limit in this state or elsewhere, the amount or quantity of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or the price or premium to be paid for insuring property against loss or damage by fire, lightning, storm, cyclone, or tornado or any other kind of policy issued by any corporation, partnership, individual, or association of persons aforesaid, shall be deemed and adjudged guilty of a conspiracy to defraud and be subject to the penalties as provided by this subchapter.

328.   FACEBOOK transacts business in the State of Arkansas.

329.   By misrepresenting the number of genuine accounts on the social network, or FACEBOOK community, FACEBOOK is able to charge more for the ads that are placed by consumers on the FACEBOOK website. This is part of a coordinated multi-departmental effort by FACEBOOK to fix the pricing of their ads.

330.    By misrepresenting that they have systems to detect and filter invalid click activity, FACEBOOK is able to charge more for the ads that are placed by Self-Serve Advertisers on the FACEBOOK website. This is part of a coordinated multi-departmental effort by FACEBOOK to fix the pricing of their ads.

331.    By misrepresenting that they have systems to detect and filter "clicks generated through fake accounts," FACEBOOK is able to charge more for the ads that are placed by Self-Serve Advertisers on the FACEBOOK website. This is part of a coordinated multi-departmental effort by FACEBOOK to fix the pricing of their ads.

332.    By misrepresenting that ads placed on the social network, or FACEBOOK community, will be marketed to real people, FACEBOOK is able to charge more for the ads that are placed by Self-Serve Advertisers on the FACEBOOK website. This is part of a coordinated multi-departmental effort by FACEBOOK to fix the pricing of their ads.

333.    By misrepresenting that "Facebook is a community where everyone uses the name they go by in everyday life. This makes it so that you always know who you're connecting with..."FACEBOOK is able to charge more for the ads that are placed by Self-Serve Advertisers on the FACEBOOK website. This is part of a coordinated multi-departmental effort by FACEBOOK to fix the pricing of their ads.

334.    By misrepresenting that FACEBOOK will "help you [Self-Serve

Advertisers] find and connect with people, groups, businesses, organizations, and others that matter to you..."FACEBOOK is able to charge more for the ads that are placed by Self-Serve Advertisers on the FACEBOOK website. This is part of a coordinated multi-departmental effort by FACEBOOK to fix the pricing of their ads.

335.   Through the generation of fake traffic from fake accounts, FACEBOOK fixes the prices of its ads.

336.   Through the generation of fake demand from fake accounts FACEBOOK fixes the prices of its ads.

## **PRAYER FOR RELIEF**

337.   WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that this Court enter an Order: (a) Certifying the United States Class and appointing Plaintiff as Class Representative;

(b) Finding that Defendants' conduct was negligent, deceptive, unfair, and unlawful as alleged herein;

(c) Enjoining Defendants from engaging in further negligent, deceptive, unfair, and unlawful business practices alleged herein;

(d) Awarding Plaintiff and the Class members nominal, actual, compensatory, and consequential damages;

(e) Awarding Plaintiff and the Class members statutory damages and penalties, as allowed by law;

(f) Awarding Plaintiff and the Class members restitution and disgorgement;

(g) Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

(h) Awarding Plaintiff and Class members punitive damages because of the unconscionable, unfair, unjust, and arrogant actions of FACEBOOK;

(I) Awarding Plaintiff and the Class members treble damages, similar to those awarded under the False Claims Act, as FACEBOOK has knowingly submitted false claims for payment to the Plaintiff and Class members;

(j) Awarding DOSHIER, as lead plaintiff, a share of the recovery as an incentive payment, similar to that awarded to a whistle blower plaintiff under the False Claims Act;

(k) Awarding Plaintiff and the Class members "reasonable attorneys' fees," costs and expenses, and;

(l) Granting such other relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all claims.

**WILLIAM F. DOSHIER, PLAINTIFF**

By: /s/ David A. Hodges

**DAVID A. HODGES**
**Attorney at Law**
**Centre Place**
**212 Center Street, Fifth Floor**
**Little Rock, Arkansas 72201-2429**
**Arkansas Bar No. 65021**
**Telephone:     (501) 374-2400**
**Facsimile:     (501) 374-8926**

**E-Mail:**   david@hodgeslaw.com
**Web:**        www.hodgeslaw.com